**Shawali KHAN, Petitioner,**

v.

**Barack H. OBAMA, et al, Respondents.**

**Civil Action No. 08–1101 (JDB).**

United States District Court, District of Columbia.

July 31, 2009.

Leonard C. Goodman, Chicago, IL, for Petitioner.

Frederick Sherwood Young, Scott Michael Marconda, Alexander Kenneth Haas, David P. Avila, David Hugh White, Julia A. Berman, Kathryn Celia Mason, Patrick D. Davis, Robert J. Prince, Terry Marcus Henry, U.S. Department of Justice, Washington, DC, for Respondents.

## MEMORANDUM OPINION

JOHN D. BATES, District Judge.

Shawali Khan, an [redacted] citizen, has been in U.S. custody since mid-November 2002. He has been detained at Guantanamo Bay, Cuba since early 2003; and on June 25, 2008, he filed a petition for a writ of habeas corpus in this Court. After several months of preliminary motions and hearings, the Court entered a Case Management Order ("CMO") on February 20, 2009. The CMO in petitioner's case is

slightly different than the CMOs in most other cases involving Guantanamo detainees. According to petitioner, extensive discovery is unnecessary in this case because respondents have not produced sufficient reliable evidence to justify his detention. Hence, petitioner sought—and received—an "expedited" CMO, which provided him with an opportunity to file a motion for judgment on the record before full discovery had been conducted. That motion is now before the Court, The motion has been fully briefed and the Court held a hearing on June 12, 2009. For the reasons explained below, petitioner's motion will be denied.

## ANALYSIS

 Respondents bear the initial burden of producing sufficient credible evidence to justify an individual's detention at Guantanamo. "[O]nce the Government puts forth credible evidence that the habeas petitioner meets the ... criteria [for detention], the onus ... shift[s] to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria." *Hamdi v. Rumsfeld*, 542 U.S. 507, 534, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004); *see also Parhat v. Gates*, 532 F.3d 834, 847 (D.C.Cir.2008).[1] The question presented here is whether respondents have satisfied their initial burden. If they have not, then the "onus" will not shift to petitioner and his habeas petition will be granted. But if respondents have met their initial burden, then petitioner's motion for judgment on the record must be denied and the discovery phase of this litigation will commence.

As a threshold matter, the Court must bear in mind that—for the purpose of this motion—petitioner has adopted the standard for detention proposed by respondents. Pet'r's Mem. at 16. On March 13, 2009, respondents proposed the following standard:

> The President has the authority to detain persons that the President determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks. The President also has the authority to detain persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces.

*See* Resps.' Rev. Mem. Re: Detention Authority. The Court must put aside, for now, the analysis of respondents' definition that was conducted in this Court's May 19, 2009 Memorandum Opinion, and will operate instead under respondents' March 13 proposed statement of its detention authority, Furthermore, for the purpose of this motion, petitioner "concedes ... that the allegations set forth against [him] in the factual return would, if they could be proven, make [him] detainable under [respondents'] definition." Pet'r's Mem. at 16.

Petitioner's concessions narrow the analysis. The only question remaining is whether enough allegations are supported by reliable, credible evidence to justify petitioner's detention. *See id.* at 18. So framed, the Court must conduct a two-part inquiry. First, it must scrutinize respondents' evidence and determine what is reliable and what is not. This examination constitutes the majority of the analysis

---

1. Respondents attached a classified version of *Parhat* to their opposition to petitioner's motion. The Court will only refer to the classified version of *Parhat* when necessary and will cite to the reported version of *Parhat* whenever possible.

that follows. The second step is determining whether the reliable, credible evidence is sufficient to justify petitioner's detention under respondents' definition of their authority to detain.

## I. Assessment of Reliability

### A. General Principles

 The Federal Rules of Evidence do not apply strictly in these Guantanamo habeas cases. Instead, courts must be flexible in evaluating the evidence presented by the parties. *See Hamdi*, 542 U.S. at 539, 124 S.Ct. 2633. "Hearsay, for example, may need to be accepted as the most reliable available evidence from the Government in such a proceeding." *Id.* at 533–34, 124 S.Ct. 2633. And given "the exigencies of the circumstances," "the Constitution would not be offended by a presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided." *Id.*

 Even under relaxed evidentiary standards, however, the credibility or reliability of the evidence must be assessable by a court lest the presumptions in favor of respondents become irrebuttable. *Parhat*, 532 F.3d at 847. The interplay between the presumptions and the requirement of reliability was squarely addressed in *Parhat*.[2] Respondents in that case re-

lied on various forms of evidence, including "four U.S. government intelligence documents" that purportedly showed that a certain group was "associated with" al Qaeda or the Taliban and was engaged in hostilities against the United States or its coalition partners. *Id.* at 844, 846; *see also Parhat*, classified slip op. at 19–24 (describing the four intelligence documents). The D.C. Circuit held that the four intelligence documents were not reliable enough to justify the petitioner's detention. The court first noted that the documents were not definitive in their conclusions—they repeatedly stated that a particular activity "reportedly" occurred and that something "may" be true.[3] *Parhat*, 532 F.3d at 846. Moreover,

> in virtually every instance, the documents do not say who "reported" or "said" or "suspected" those things. Nor do they provide any of the underlying reporting upon which the documents' bottom-line assertions are founded, nor any assessment of the reliability of that reporting. Because of those omissions, the Tribunal could not and this court cannot assess the reliability of the assertions in the documents. And because of this deficiency, those bare assertions cannot sustain the determination that [petitioner] is an enemy combatant.

2. Respondents attempt to distinguish *Parhat* because it involved review of a determination made by a Combatant Status Review Tribunal (CSRT), not a habeas proceeding, and that more "flexible" procedures are permitted in habeas proceedings such as these. *See* Resps.' Opp. at 15. This distinction is unconvincing. The Supreme Court has held that CSRT proceedings are not sufficiently rigorous to qualify as an adequate substitute for habeas. *See Boumediene v. Bush*, — U.S. —, 128 S.Ct. 2229, 2271–74, 171 L.Ed.2d 41 (2008). Hence, as *Parhat* itself recognized, respondents' evidence is subject to more stringent requirements in a habeas proceeding than in review of a CSRT determina-

tion. *See Parhat*, 532 F.3d at 851 ("[T]he habeas proceeding will have procedures that are more protective of [petitioner's] rights than those available under the [Detainee Treatment Act].").

3. Respondents point out that *Parhat* involved "finished" intelligence reports whereas the present case involves "raw" intelligence reports. *See* Resps.' Opp. at 15–16. *Parhat*, respondents maintain, is thus distinguishable. But, as discussed in greater detail below, the flaws the *Parhat* court identified are not unique to finished intelligence reports, so this distinction, if it is a difference at all, certainly does not make *Parhat* inapplicable here.

*Id.* at 846–47. The court reached this conclusion because "[i]f a Tribunal cannot assess the reliability of the government's evidence, then the 'rebuttable' presumption becomes effectively irrebuttable." *Id.* at 847 (citing *Bismullah v. Gates*, 501 F.3d 178, 186 (D.C.Cir.2007)).

Respondents in *Parhat* offered two reasons why identifying the sources of information was unnecessary to assess reliability. Each was rejected by the court. First, the court considered respondents' contention that "assertions in the intelligence documents are reliable because they are made in at least three different documents." *Id.* at 848. The court rejected the argument, observing that "the fact that the government has 'said it thrice' does not make an allegation true." *Id.* (quoting Lewis Carroll, *The Hunting of the Snark* 3 (1876)). Indeed, the court noted that all of the documents making a particular allegation "may ultimately derive from a single source." *Id.* at 849. Second, the court considered respondents' contention "that the statements made in the documents are reliable because the State and Defense Departments would not have put them in intelligence documents were that not the case." *Id.* The court dismissed this argument as well, writing that "[t]his comes perilously close to suggesting that whatever the government says must be treated as true." *Id.*

Hence, *Parhat* contemplates the following decisional framework. First, courts must determine whether the evidence relied upon contains enough information to permit an assessment of reliability. If it does, then courts must examine that information and determine whether the evidence is in fact sufficiently reliable to be used as a justification for detention. But if it does not contain enough information, and if it is not corroborated by otherwise reliable evidence, then courts are precluded from assessing the evidence's reliability. And if courts cannot assess reliability, then

the evidence in question is inherently unreliable and may not be relied upon to justify detention.

What information, then, must respondents provide to permit courts to assess the reliability of evidence gathered during intelligence operations? The Declaration of [redacted] attached to respondents' factual return, provides some insight. To evaluate the credibility of human intelligence, collectors of intelligence look at "two broad areas." [redacted] Decl. at 8. First, they look at an intelligence report's [redacted] *Id.* at 8–9. Second, intelligence collectors examine [redacted] *Id.* at 9. These principles—set out by respondents themselves—provide the best set of criteria for a court to use to determine whether the raw intelligence reports respondents rely upon to justify petitioner's detention are reliable and credible.

█ In sum, these Guantanamo habeas proceedings require greater flexibility than normal civil or criminal proceedings. But under *Parhat*, courts must still be able to assess the reliability and credibility of the evidence respondents rely upon to justify detention. The mere fact that the intelligence community relies upon a certain kind of information does not relieve courts of their duty independently to assess the evidence. The [redacted] Declaration aids courts in carrying out this duty because it sets out criteria that intelligence collectors themselves look to in assessing the reliability or credibility of intelligence documents. If the evidence respondents rely upon to justify detention does not provide enough information to permit assessment of the [redacted] factors—or only does so in a way that nonetheless precludes a court from assessing the reliability of the evidence—then the evidence cannot be relied upon to justify detention. With these principles in mind, the Court will proceed

with its analysis of the evidence in this case.

## B. Analysis of Respondents' Evidence

Respondents rely on four categories of evidence ... First are reports of petitioner's own statements, including a transcript of Administrative Review Board ("ARB") proceedings. Petitioner only challenges the reliability of two essentially identical reports, both stemming from a February 17, 2003 interview of him. *See* Petr's Rep. at 2–3. The contents of those two interview reports are not material to the resolution of petitioner's motion, and he concedes that the remaining interview reports may be deemed reliable at this stage of the proceedings. *Id.* Second are twelve "raw intelligence reports" concerning petitioner.[4] He challenges the reliability of all of these reports under *Parhat* because they all contain at least some level of hearsay and the sources for the reports are confidential. *See id.* at 5–8. Third are six reports cataloging materials allegedly found in petitioner's home. Petitioner challenges the reliability of these reports as well. *Id.* at 4–5. The final category is reports of statements made by other detainees. Only one document falls into this category. *See* ISN 850 FD–302 (May 28, 2003). But it does not advance respondents' case for petitioner's detention, and he does not challenge its reliability.

## 1. Raw Intelligence Reports

The initial step in analyzing the raw intelligence reports is determining which,

if any, have sufficient hallmarks of reliability—as set out in the[redacted]—to allow the Court to assess their reliability and credibility. Reports lacking those hallmarks of reliability—which, as discussed below, is *all* of the reports—are inherently unreliable under *Parhat* and may not be relied upon to justify detention.[5] Two crucial deficiencies—although not the only ones—in the reports are that they contain multiple levels of hearsay and all sources are confidential (*i.e.,* unidentified). But, as respondents point out, even if particular evidence is unreliable standing alone, it may nonetheless be reliable if corroborated by other reliable evidence. *See Rugendorf v. United States,* 376 U.S. 528, 533, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964) (holding that an affidavit in support of a search warrant containing hearsay from a confidential source may be reliable "so long as there was a substantial basis for crediting the hearsay"); *see also Parhat,* 532 F.3d at 849 ("[T]here may well be other forms in which the government can submit information that will permit an appropriate assessment of the information's reliability while protecting the anonymity of a highly sensitive source.").

■■■ Hence, once the Court has determined that none of the raw intelligence reports are reliable on their own, it must still assess whether other reliable evidence adequately corroborates the allegations made in those reports. In making this latter determination, the Court will bear in mind the procedural posture of this case.

---

4. Fourteen raw intelligence reports are attached to the factual return. But two of those have nothing to do with petitioner. *See* [redacted]

5. This determination should not be interpreted as a holding that raw intelligence reports such as [redacted] and [redacted] are categorically unreliable. As respondents point out, [redacted] are similar to Federal Bureau of Investigation FD–302 documents, which are

often used as evidence. *See* Resps.' Opp. at 10 (citing, *inter alia, Moore v. Ashcroft,* 401 F.Supp.2d 1, 12 (D.D.C.2005)). Indeed, one [redacted] respondents apparently have attached to petitioner's factual return by mistake—[redacted]—contains detailed information about the source and his placement. Such a raw intelligence report might well be reliable under the standards set forth in *Parhat.*

14

The question now presented is whether respondents have satisfied their initial burden of justifying petitioner's detention. Petitioner argues in favor of a standard akin to the Fed.R.Civ.P. 56 summary judgment standard. *See* Pet'r's Mem. at 17. Such a standard might be appropriate once discovery has transpired. Here, however, petitioner requested and received an "expedited" CMO that permitted him to file a motion for judgment on the record before discovery has occurred. Because he contends that respondents have failed to meet their initial burden of justifying his detention, the present motion is more like a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6). In any event, inferences are drawn in favor of the non-movant for both motions for summary judgment and motions to dismiss. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (motion to dismiss). So, for the purpose of this motion, the Court will draw inferences on all disputed issues in respondents' favor.

### a. Report–by–Report Analysis

■ [redacted] This report states petitioner's [redacted][6] [redacted] was active in Hezb–i–Islami Gulbuddin ("HIG"), and that HIG has taken actions to harm U.S. forces. The source for the report is a "senior level Afghan tribesman" with "indirect access due to his position" and whose reliability is "yet to be determined." No other information is provided in the source description. The report does not explain why the source had indirect access to this information, what kind of control the collector had over the source, or what kind of motivation or wittingness the source had

when making the statement. *See* [redacted] Decl. at 8–9. Nor does the report provide any "context statement" regarding the circumstances in which the information was obtained. *See id.* at 9. The report thus bears none of the hallmarks of reliability that the intelligence community itself looks to in assessing the reliability of raw, human intelligence. Absent such indicia of reliability, this Court cannot assess the report's reliability. Hence, under *Parhat*, unless other reliable evidence corroborates the information contained in the report, it may not be used to justify petitioner's detention.

[redacted]

[redacted] According to this report, which does not mention petitioner, a HIG cell in Kandahar was responsible for explosions near the Kandahar airfield in October 2002. HIG had reportedly conducted surveillance of U.S. vehicles and devised a plan for attacking them. The source for the report is an "Afghan civilian" who obtained the information during the "normal course of daily activities," had "direct access," and whose reliability is "yet to be determined." [redacted]

[redacted] Like those reports, it is lacking the indicia of reliability set forth in the [redacted] Declaration, and it therefore cannot be relied upon absent corroboration by other evidence.

[redacted] A small HIG cell entered Kandahar, according to this report, and petitioner was a communicator and used a radio in his [redacted] to communicate between various HIG elements. The report also details various terrorist activities undertaken by [redacted] and another man affiliated with HIG, [redacted] Like the report immediately above, the source is an

---

**6.** Most of the materials attached to petitioner's factual return refer to [redacted] as petitioner's [redacted] In one statement however, petitioner avers that [redacted] is not his [redacted] but instead is his [redacted] *See* [redacted]

"Afghan civilian" who obtained the information during the "normal course of daily activities," had "direct access," and whose reliability is "yet to be determined." And hence, also like the reports above, this report is lacking sufficient indicia of reliability for the Court to assess its credibility.

■ [redacted] These reports both describe a planned attack on U.S. vehicles. Neither mentions petitioner. The source for the October 30 report is an "Afghan civilian" with "direct access" who obtained the information during the "normal course of daily activities," whereas for the November 3 report the source is an "Afghan government official" with "indirect access" who obtained the information during the "normal course of official duties." The reliability for both sources is "yet to be determined." These reports are flawed for the same reasons explained for the other reports above. Under *Parhat*, neither report, standing alone, may be relied upon to justify petitioner's detention.

■ [redacted] This report states that petitioner first became involved with HIG during the jihad against the former Soviet Union. It claims that petitioner then became a HIG facilitator who used [redacted] his in Kandahar to conduct meetings. The report also avers that petitioner delivered a detonation device on November 9, 2002, which was to be used for attacks against the United States. The source is an "Afghan government official" who obtained the information during the "normal course of official duties," who has "indirect access," and whose "reliability is yet to be determined." Like all of the reports described above, this report is lacking sufficient hallmarks of reliability and hence cannot justify petitioner's detention absent corroboration.

■ [redacted] According to this report, petitioner was the leader of a HIG propaganda group in Kabul, and an unnamed HIG and Taliban facilitator incited a protest at the University of Kabul on November 11–12, 2002. The report also states that petitioner was captured by U.S. forces on [redacted]. The source description for this report is slightly different than the other reports discussed above. The source is an unnamed [redacted] who obtained the information during the "course of official duties" and had "indirect access." The source has "reported reliably in the past." But it is also stated that the report contains "third-hand information, some of which has been verified through actual reported events."[7] Although slightly different than the reports described above, this report suffers from similar flaws. The unnamed [redacted] has reported reliably, but the report explicitly contains "third-hand information" with no reference to the source of that information. And like the reports above, the report lacks a context statement, any information about the collector's control over the source, or a description of the source's motivation or wittingness. The Court cannot assess the reliability of this report, and, under *Parhat*, the report therefore cannot be used to justify petitioner's detention.

■ [redacted] These reports provide that [redacted] held a meeting after petitioner's capture. [redacted] was reportedly concerned about the effectiveness of the HIG cell in Kandahar without petitioner, and was looking for whoever had provided information leading to his capture. The source of both reports is an "Afghan government official" who obtained the information during the "normal course of offi-

---

7. The report does not explain what information was verified through actual reported events.

cial duties," had "indirect access," and whose reliability is "yet to be determined." Like all of the other reports, these two reports lack the [redacted] indicia of reliability, thus preventing the Court from assessing their credibility.

■ [redacted] A HIG cell entered Kandahar on December 28, 2002, according to this report. It names the leader of the cell (not petitioner), and describes petitioner as "a HIG extremist arrested by [redacted]. The report has two sources, both "Afghan government officials" who obtained the information during the "normal course of official duties" and had "indirect access." One source's reliability is "yet to be determined" and the other is "fairly reliable." Although the report is slightly different than the majority of reports above in that it provides that one source is "fairly reliable," it is still lacking the critical hallmarks of reliability set forth in the [redacted] Declaration. Hence, like the other reports, it cannot justify detention under *Parhat* unless some distinct reliable evidence corroborates the facts contained in the report.

■ [redacted] According to this report, a personal phone book was found on a driver who attempted to run through a checkpoint. The phone book contained an entry for [redacted] and listed a Saudi cell phone number. The report contains no information whatsoever describing the source. The report is thus completely lacking indicia of reliability and cannot be relied upon to justify detention absent further corroboration.

■ [redacted] This report provides that members of HIG and al Qaeda met on July 20, 2003 and agreed to attack U.S. forces. It does not mention petitioner. Like many of the reports above, the source is an "Afghan government official" who obtained the information during the "normal course of official duties," had "indirect access," and whose reliability is "yet to be

determined." And, like those other reports, the absence of the criteria set forth in the [redacted] Declaration bars this Court from assessing the reliability of the report. Hence, unless the information contained in the report is independently corroborated, respondents may not rely on this report to justify petitioner's detention.

\*　　\*　　\*

In addition to the deficiencies described above, the reports, read together, contain another crucial flaw: all of the information contained in the reports could come from a single individual. No source is identified by name. To be sure, the source descriptions vary slightly: a "senior level Afghan tribesman"; an "Afghan civilian"; or an "Afghan government official." But on the record before the Court, those descriptions could all refer to the same person. The only report that provides a different source description is [redacted], which states that the source is an unnamed [redacted] but also states that the report contains "third-hand information." The information provided in this report, then, could be from the same person listed as the source in all of the other reports.

The D.C. Circuit confronted a similar problem in *Parhat*. The materials respondents relied upon in that case also failed to identify the sources of allegations, and the court noted that all of the documents making a particular allegation "may ultimately derive from a single source." 532 F.3d at 849. When respondents argued that the court could find the allegations reliable because similar allegations were made in multiple documents, the court noted that "the fact that the government has 'said it thrice' does not make an allegation true." *Id.* at 848 (quoting Carroll, *The Hunting of the Snark* 3). This Court agrees. Unless respondents can demonstrate that multiple sources were making similar allegations about petitioner, these raw intelligence re-

ports cannot corroborate one another. But nothing in the current record suggests that the raw intelligence reports relied upon here come from multiple sources. Hence, only if other evidence in the record corroborates the allegations contained in those reports may respondents rely upon such allegations at this stage of the proceedings.

### b. Corroboration for Allegations Made in Raw Intelligence Reports

 As respondents would have it, the raw intelligence reports, woven together, support the following narrative: (1) petitioner was active in HIG during jihad against the former Soviet Union, *see, e.g.,* [redacted] (2) HIG was and remains a terrorist organization, *see, e.g.,* [redacted]; (3) petitioner's [redacted] was a HIG commander, *see, e.g.,* [redacted]; (4) petitioner was active in HIG as a communicator or facilitator at the time of his capture in [redacted] *see, e.g.,* [redacted]; (5) [redacted] (6) petitioner delivered a detonation device for attacks on U.S. forces, *see* [redacted] (7) he was a HIG propaganda leader in Kabul, *see* [redacted]; and (8) his name was found in the personal phone book of a man who attempted to run through a U.S. checkpoint, *see* [redacted]. As discussed in the preceding section, none of the raw intelligence reports—either individually or collectively—contain enough information to permit the Court to assess their reliability. In this section, the Court will examine whether other evidence in the record—such as petitioner's own statements—corroborate any aspects of respondents' narrative as drawn initially from the intelligence reports.

 The first aspect—that petitioner was active in HIG during jihad against the former Soviet Union—is amply corroborated by other reliable evidence. Although petitioner has occasionally denied this charge, *see, e.g.,* [redacted] he has more often than not admitted it, *see, e.g.,* ISN FM–40 (Feb. 21, 2003). Likewise, HIG's characterization as a violent organization, the second aspect of respondents' narrative, is also supported by independent, reliable evidence. For example, the Declaration of [redacted] a Senior Intelligence Analyst at the [redacted] describes HIG's "30–year history of supporting jihad in Afghanistan" and explains HIG's "important and deliberate role in supporting continued attacks against coalition and Afghan forces throughout 2002." [redacted] Decl. at 1–2. So, too, [redacted] role as a HIG commander has independent, reliable support. His precise role is subject to debate—for example, petitioner stated on one occasion that [redacted] was only a HIG commander during jihad against the former Soviet Union, *see* ARB Tr. at 5–6—but petitioner's admission that [redacted] has a history as a HIG commander is sufficient, at this stage, to corroborate the raw intelligence reports on this third aspect of respondents' narrative.

 The fourth aspect of the narrative is petitioner's role in HIG at the time of his capture. This is a crucial subject. Petitioner's continuing involvement in HIG is mentioned in two of the raw intelligence reports, *see* [redacted] and [redacted], and alluded to in two others, *see* [redacted] and [redacted] Of course, an allegation does not become reliable merely because it is supported by several unreliable reports. *See Parhat,* 532 F.3d at 848: *cf. Ali Ahmed v. Obama,* 613 F.Supp.2d 51, 56 (D.D.C.2009) ("[T]he mosaic theory is only as persuasive as the tiles which compose it and the glue which binds them together—just as a brick wall is only as strong as the individual bricks which support it and the cement that keeps the bricks in place. Therefore, if the individual pieces of a mosaic are inherently flawed or do not fit together, then the mosaic will split apart,

just as the brick wall will collapse."). But other, more reliable, evidence also lends some credence to this aspect of respondents' narrative, at least at this early stage of the proceedings. [redacted] *See* ISN 899 FM–40 (Feb. 7, 2003), ISN 899 FM–40 (Feb. 21, 2003), and [redacted] *but see* [redacted] This admission corroborates respondents' allegation that petitioner was once a HIG communicator, albeit twenty or more years before his capture. To be sure, petitioner denies the allegation that he was a HIG communicator at the time of his capture. Moreover, the Court will not adopt a "once a HIG communicator, always a HIG communicator" approach. But at this stage of the proceedings, the Court must draw inferences in respondents' favor, and inferring that petitioner remained a HIG communicator from the fact that he once was a HIG communicator (and his [redacted] has a history as a HIG leader) does not require a fertile imagination. Hence, petitioner's admissions that he once was a HIG radio operator serve to corroborate that he also was one at the time of his capture in [redacted] The Court does not intimate that there is strong support for that conclusion. But at this time and with all inferences drawn in respondents' favor, there is sufficient corroboration to rely on that assertion.

■■■ The remaining four aspects of respondents' narrative, however, are entirely lacking in corroboration.[redacted] neither in petitioner's statements nor corroborative evidence, elsewhere, Similarly, the only source of respondents' assertion that petitioner delivered a detonation device for attacks on U.S. forces is a single, unreliable raw intelligence report. *See* [redacted]. The same holds true for respondents' claims that petitioner was a HIG propaganda leader in Kabul, *see* [redacted], and that petitioner's name was found in the personal phone book of a man who attempted to run through a U.S. checkpoint, *see* [redacted]. Lacking any corrobora-

tion, these reports must stand on their own. But because they lack the information the Court needs to gauge their reliability, the allegations in the reports cannot be used to justify petitioner's detention. *See Parhat*, 532 F.3d at 847–48. Hence, none of these last four aspects of respondents' narrative are reliable enough for respondents, and hence this Court, to rely on them in justifying petitioner's detention.

In sum, of the eight aspects of respondents' narrative set out above, only half may be used to justify petitioner's detention at this stage of the proceedings. The allegations [redacted] that HIG was a terrorist organization at the time of petitioner's capture, that [redacted] was a HIG commander, and that petitioner was active in HIG as a communicator at the time of his capture are sufficiently corroborated for respondents to rely upon them at this stage of the proceedings. Because the remaining allegations are not supported by reliable evidence, the Court will not consider those assertions in resolving petitioner's motion for judgment on the record.

### 2. Materials Found in Petitioner's Home

Six reports from the so-called [redacted] database describe materials found in petitioner's home after his capture in [redacted] The first describes an Arabic notebook containing information regarding assassinations and a plan to kidnap the President of the United States.[redacted]. The notebook also contains information regarding intelligence, surveillance, and counterfeiting. The second report describes a book of poetry (in Arabic) written by Abu Hafs, an al Qaeda leader. [redacted]. Third is a report cataloging money worth about 50 cents. [redacted] The fourth report describes Persian or Farsi documents that appear to be someone else's personal documents, but also contain information about

land mine recognition. [redacted] Fifth is a report about an Arabic notebook describing the use of several kinds of weapons. According to the report, the first page of the notebook "has the name of [redacted] who's most likely to be the owner of this notebook." [redacted]. The final report describes Pushtu music in praise of the Taliban. [redacted].

■■■ Petitioner contends that these reports are unreliable for the same reasons the raw intelligence reports are unreliable. But raw intelligence reports are "human intelligence" whereas these reports describe physical items found in petitioner's home. Therefore, the same [redacted] hallmarks of reliability analysis does not apply. [redacted] *See, e.g.,* [redacted]. *Id.* But he does not deny that these materials were found in his home. The reason he possessed these materials, then, requires a credibility determination that this Court cannot make at this stage of the proceedings. Hence, because the reports of physical items found in petitioner's home are not inherently unreliable in the same way the other raw intelligence reports are, respondents may rely on these reports at this stage of proceedings to justify petitioner's detention.

## II. Reliable Evidence to Justify Petitioner's Detention

To determine whether respondents have provided sufficient reliable evidence to satisfy their initial burden of justifying petitioner's detention, the Court will apply respondents' standard for their authority to detain,[8] under which a person who was "part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported

hostilities, in aid of such enemy armed forces" may be detained. *See* Resps.' Rev. Mem. Re: Detention Authority. As discussed above, the reliable evidence presented by respondents to justify petitioner's detention is as follows: petitioner was active in HIG during jihad against the former Soviet Union; HIG was a terrorist organization at the time of petitioner's capture; [redacted] was a HIG commander; petitioner was a HIG communicator at the time of his capture; and petitioner possessed some al Qaeda-or Taliban-related material at the time of his capture. Additionally, petitioner has stated that he was conscripted by the Taliban in the late 1990s and worked as a guard and laborer for two months. *See* ISN 899 FM–40 (Feb. 7, 2003); *see also* ARB Tr. at 3–4.

■■■ The question, then, is whether this evidence is sufficient for respondents to meet their initial burden of demonstrating that petitioner's detention is justified. The Court determines that it is. Respondents have provided enough evidence to show that HIG qualifies as an "associated force[ ] . . . engaged in hostilities against the United States or its coalition partners." *See* [redacted] Decl. at 2 ("HIG [has] played an important and deliberate role in supporting continued attacks against coalition and Afghan forces throughout 2002."). And respondents have provided enough credible, reliable evidence to show that petitioner was "part of" HIG in that he was a communicator or facilitator at the time of his capture. *See* [redacted] (describing petitioner as a HIG facilitator who conducts meetings in his [redacted] ), [redacted] (describing petitioner as a HIG radio communicator), [redacted] (describing petitioner as a HIG facilitator), and [redacted] (describing [redacted] concern that HIG would be less

---

8. As discussed previously, petitioner has accepted respondents' statement of the deten-

tion authority for the purpose of the present motion. Petr's Mem. at 16.

**20**

effective in Kandahar after petitioner's capture); *see also* ISN 899 FM–40 (Feb. 7, 2003) (admitting he was a radio operator during jihad again the former Soviet Union), ISN 899 FM–40 (Feb. 21, 2003) (same); and [redacted] (same). Hence, this evidence supports the conclusion that petitioner was "part of, or substantially supported" HIG, which is associated with al Qaeda or the Taliban in hostilities against the United States. On that basis, petitioner's motion for judgment on the record must fail.

## CONCLUSION

To be clear, the Court offers no opinion at this stage of the proceedings as to whether this evidence and these allegations are ultimately sufficient to justify petitioner's detention under the Court's May 19, 2009 interpretation of respondents authority to detain. Similarly, the Court offers no opinion as to petitioner's credibility or the ultimate inferences that it will draw from the evidence as presented. The Court only holds that although much of respondents' evidence is fatally lacking adequate indicia of reliability, the evidence that remains is sufficient—under respondents' previous interpretation of their authority to detain—to warrant denial of petitioner's motion. Accordingly, petitioner's motion for judgment on the record will be denied. A separate order accompanies this opinion.