# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 6, 2010          Decided June 30, 2010

No. 09-5331

FAWZI KHALID ABDULLAH FAHAD AL ODAH, DETAINEE AND
KHALED AL ODAH, NEXT FRIEND OF FAWZI KHALID
ABDULLAH FAHAD AL ODAH,
APPELLANTS

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:02-cv-00828-CKK)

———

*David J. Cynamon* argued the cause for appellants. With him on the briefs were *Matthew J. MacLean* and *Thomas G. Allen.*

*Charles W. Scarborough*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Ian Heath Gershengorn*, Deputy Assistant Attorney General, and *Robert M. Loeb*, Attorney. *August E. Flentje*, Attorney, entered an appearance.

Before: SENTELLE, *Chief Judge*, ROGERS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: Fawzi Khalid Abdullah Fahad al Odah, a detainee at Guantanamo Bay, Cuba, and his next friend appeal from the district court's denial of his petition for a writ of habeas corpus. Appellants contend that the preponderance of the evidence standard employed by the district court is unconstitutional. That argument is foreclosed by precedent. Appellants further contend that the district court erred in admitting hearsay evidence. Again, controlling precedent is against them. Lastly, they argue that the evidence is insufficient to show that al Odah was "part of" al Qaeda and Taliban forces. We hold that the evidence is sufficient to support the district court's finding. Accordingly, we affirm the district court's denial of al Odah's petition for a writ of habeas corpus.

## I. BACKGROUND

The legal framework that governs habeas petitions from detainees held at Guantanamo Bay, Cuba has been thoroughly explained in *Al-Bihani v. Obama*, 590 F.3d 866, 869 (D.C. Cir. 2010) and *Awad v. Obama*, No. 09-5351, ___ F.3d ___, slip op. at 2-3 (D.C. Cir. June 2, 2010). As relevant to this appeal, *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), held that federal courts have jurisdiction over habeas petitions from individuals detained at Guantanamo Bay, Cuba. The *Authorization for Use of Military Force*, Pub. L. No. 107-40, 115 Stat. 224 (2001) ("AUMF"), provides:

> That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned,

authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

This gives the United States government the authority to detain a person who is found to have been "part of" al Qaeda or Taliban forces. *See Awad*, slip op. at 19; *Al-Bihani*, 590 F.3d at 871-72; *see also Barhoumi v. Obama*, No. 09-5383, ___ F.3d ___, slip op. at 12-14 (D.C. Cir. June 11, 2010).

### A. Factual Background

Fawzi Khalid Abdullah Fahad al Odah ("al Odah") was born in Kuwait City, Kuwait in 1977. In August of 2001, al Odah traveled to Afghanistan. Al Odah, a teacher, contends that he went there to do charity work and teach the Koran to the poor and needy for two weeks before the start of his next school year. The government contends that al Odah's purpose in making the trip was to join the Taliban in its fight against the Northern Alliance.

On August 13, 2001, al Odah paid cash for a one-way ticket and flew from Kuwait to Dubai, United Arab Emirates. The next day, he paid cash for a one-way ticket and flew from Dubai to Karachi, Pakistan. Al Odah stayed in Karachi for a day or two, and then paid cash for a one-way ticket and flew from Karachi to Quetta, Pakistan. Al Odah then traveled by car from Quetta, Pakistan to Spin Buldak, Afghanistan.

In Spin Buldak, al Odah met with a man named ███████. ███████ was an official with the Taliban government. Al Odah claims that he met with ███████ seeking guidance on where he could teach the Koran. The United States asserts that

al Odah sought out a Taliban official to find information on joining al Qaeda and the Taliban. Al Odah contends that ██████ ██████ took him around the countryside to teach at several schools in the area. The government argues, and the district court found, that this contention was not credible because al Odah could not provide the names of any of the students he taught, the names of any of the schools at which he taught, or the names of any of his fellow teachers.

After some period of time, ███████ took al Odah to a Taliban-run camp for a day. While at this camp, al Odah admits that he engaged in target shooting with a Kalashnikov AK-47 rifle. At some point (exactly when is unclear), al Odah then traveled with ██████████ from Spin Buldak to Kandahar.

Al Odah was in Kandahar on the day of the September 11, 2001 terrorist attacks. After September 11, on ██████'s recommendation, al Odah rented a car and drove from Kandahar to Logar Province, Afghanistan. Al Odah argues that he made this trip to try to stay safe and get out of Afghanistan. The government points out that if al Odah felt unsafe, he could have left Afghanistan more quickly by retracing the route by which he arrived.

While in Logar Province, al Odah sought out ██████████, a man recommended by ██████████. The evidence indicates that al Odah stayed in Logar Province at ██████████'s home, free of charge, for about a month. Al Odah left his video camera, passport, and other documents with ██████████. There is no evidence as to what al Odah did during this month.

After his time in Logar Province, al Odah, at ████████'s suggestion, traveled to Jalalabad, Afghanistan. In Jalalabad, al Odah stayed with a man named ██████████. There were a number of other people staying in ████████'s house. Some of

the men there carried weapons. Al Odah stayed at ████████'s house for about ten days. At some point during these ten days, ████████ gave al Odah a Kalashnikov AK-47 rifle.

Al Odah then left Jalalabad and, on foot, headed through the White Mountains in the Tora Bora region. He traveled with a group of about 150 men, some of whom were armed. Al Odah carried his AK-47 with him throughout this journey. The group with which al Odah was traveling was attacked by US and allied air strikes, but al Odah himself was never injured.

When al Odah reached the Afghanistan-Pakistan border, he was detained by Pakistani guards. The exact date he was detained is disputed, but it was sometime between mid-November and mid-December 2001. At the time of his capture, al Odah still had his AK-47 with him. Al Odah was transferred to US custody, and has been detained at Guantanamo Bay, Cuba since early 2002.

Since al Odah's initial detention, additional incriminating evidence has come to light. ████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████ Additionally, al Odah's name and phone number appeared on a document on al Qaeda's official website. ████████████████████ ████████████████████████ ████ Lastly, al Odah's passport, which he left with ████████ in Logar Province, was later recovered from an al Qaeda safehouse in Karachi, Pakistan. Also at this safehouse, an individual named ████████ was captured.

B. Procedural Background

On May 1, 2002, al Odah, through his next friend, Khaled al

Odah, along with eleven other Guantanamo Bay detainees filed a petition for a writ of habeas corpus in the United States District Court for the District of Columbia. Since then, the habeas petitions have been the subject of extended litigation involving jurisdictional questions. *See Rasul v. Bush*, 215 F. Supp. 2d 55 (D.D.C. 2002); *Al-Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003); *Rasul v. Bush*, 542 U.S. 466 (2004); *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005); *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007); *Boumediene v. Bush*, 128 S. Ct. 2229 (2008). After *Boumediene v. Bush* established that the district court had jurisdiction to hear al Odah's petition, the court considered al Odah's petition on the merits.

After receiving the government's factual return and the parties' various filings, the district court held a three-day hearing. On August 24, 2009, the district court denied al Odah's petition for a writ of habeas corpus. *Al Odah v. United States*, 648 F. Supp. 2d 1 (D.D.C. 2009).

In *Hamdi v. Rumsfeld*, 542 U.S. 507, 533-34 (2004) (plurality op.), the Supreme Court said:

> [T]he exigencies of the circumstances may demand that, aside from these core elements, enemy-combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict. Hearsay, for example, may need to be accepted as the most reliable available evidence from the Government in such a proceeding.

Relying upon this language from the Supreme Court, the district court stated that it would allow the use of hearsay by both parties. 648 F. Supp. 2d at 4-5. The district judge reasoned

7

"[t]he Court is fully capable of considering whether a piece of evidence (whether hearsay or not) is reliable . . . ." *Id.* at 5. The court denied the government's motion to have its evidence admitted with a presumption of accuracy and authenticity. *Id.* at 5-6. The court then discussed how intelligence documents can be unreliable. *Id.* With regards to al Odah's motion to exclude certain pieces of evidence, the court declined to do so, and instead held that "the better approach is to make such determinations after considering all of the evidence in the record and hearing the parties' arguments thereto . . . . Accordingly, the Court's consideration of the evidence proffered by the parties shall encompass inquiries into authenticity, reliability, and relevance." *Id.* at 6.

The court held that the government had the burden of demonstrating by a preponderance of the evidence that al Odah was lawfully detained. *Id.* at 8. It further held that the President had the authority under the AUMF to detain al Odah if the government established according to that evidentiary standard that he was "part of" the Taliban, al Qaeda, or associated enemy forces. *Id.* at 6-7.

In weighing the evidence, the court found that al Odah had not offered any credible explanation for his trip to Dubai en route to Afghanistan. *Id.* at 8-9. It also found that al Odah's travels through Afghanistan contradicted his other statements that his intention was only to teach in Afghanistan for two weeks. *Id.* at 9. The court also found that al Odah's offered reason for going to Afghanistan lacked credibility because although he claimed he taught at schools in Afghanistan for two weeks, he was unable to provide the names of the places where he taught, the names of any of his fellow teachers, or the names of any of his students. *Id.* at 9-10. The court discussed evidence that the travel route used by al Odah was a common travel route for those going to Afghanistan to join the Taliban. *Id.* at 9-10. It found "that this

record supports a reasonable inference that Al Odah may have also been traveling to Afghanistan to engage in jihad, and not to teach the poor and needy for two weeks." *Id.* at 10.

The district court also found that the reasons al Odah offered for not leaving Afghanistan immediately after September 11 lacked credibility and were not consistent with his other statements. *Id.* at 11-12. The court found that al Odah's pattern of staying at houses and his surrendering of his passport were consistent with al Qaeda and Taliban operating procedures. *Id.* at 12. The court recounted the time line of al Odah's travels, and found that his capture occurred on or around December 18, 2001, *id.* at 12-13, a date that corresponds with the Battle of Tora Bora, which occurred between approximately December 6 and 18, 2001.

The court noted that al Odah's statements failed to account for one month of his time in Afghanistan. *Id.* at 13. It stated that al Odah's explanation for why he was traveling through the Tora Bora mountains was not credible. *Id.* at 13-14. The district court wrote that the "evidence reflects that Al Odah made a conscious choice to ally himself with the Taliban instead of extricating himself from the country." *Id.* at 15. The court found, based on this evidence, that it was "more likely than not that Al Odah became part of the Taliban's forces." *Id.*

The court noted that there was other evidence presented (eyewitness identification of al Odah and ███████████████ ███████████ ████████████), but that it did not need to consider that evidence because it had already found that the Government had presented adequate factual information to meet its burden by a preponderance of the evidence to show that al Odah was "part of" al Qaeda and the Taliban. *Id.* at 15, n. 17.

The court also made an additional finding that the camp that

al Odah attended where he engaged in the target shooting with the AK-47 was "more likely than not Al Farouq," a terrorist training camp. *Id.* at 16. The court discussed similarities in geography and operation between the camp al Odah attended and the Al Farouq camp. *Id.* The court noted the fact that there was a trainer at Al Farouq who went by the name ████, which was very similar to the name of the Taliban official from whom al Odah followed directions for several weeks. *Id.* at 16-17. It also noted similarities between the physical descriptions of the two. *Id.* at 17. The court then concluded

> that the Government has met its burden based on the evidence in the record without specifically identifying that the Taliban-run camp attended by Al Odah was, in fact, Al Farouq. Nevertheless, the Court also finds that it is more likely than not that the camp was Al Farouq, which also makes it more likely than not, when combined with the other evidence in the record, that Al Odah became a part of the forces of the Taliban and al Qaeda.

*Id.* at 18. On September 8, 2009, al Odah filed a notice of appeal.

## II. ANALYSIS

Al Odah challenges the procedure followed by the district court in admitting evidence and the sufficiency of the evidence to support its findings and judgment. Because the procedural issues inform our analysis of the sufficiency questions, we shall address the procedural challenges first.

### A. Procedural Challenges

Al Odah makes two procedural challenges. As we noted

above, the district court held both that the government had to meet its burden by a preponderance of the evidence and that it would admit hearsay evidence subject to review for reliability. Al Odah argues that the preponderance of the evidence standard is unconstitutional and that the district court cannot admit hearsay evidence unless it complies with the Federal Rules of Evidence. We review al Odah's challenge to the evidentiary standard *de novo* because it is a question of law. *See Awad*, slip op. at 17; *Al-Bihani*, 590 F.3d at 870. Our review of the district court's admission of evidence, including its admission of hearsay evidence, is for abuse of discretion. *See United States v. Bailey*, 319 F.3d 514, 517 (D.C. Cir. 2003); *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 9 (D.C. Cir. 2001). We can dispatch both of these assignments of error in short order.

Al Odah argues that the government can deprive a person of his liberty only if it meets its evidentiary burden by clear and convincing evidence. But this argument fails under binding precedent in this circuit. It is now well-settled law that a preponderance of the evidence standard is constitutional in considering a habeas petition from an individual detained pursuant to authority granted by the AUMF. *See Awad*, slip op. at 17-18 ("A preponderance of the evidence standard satisfies constitutional requirements in considering a habeas petition from a detainee held pursuant to the AUMF."); *Al-Bihani*, 590 F.3d at 878 ("Our narrow charge is to determine whether a preponderance standard is unconstitutional. Absent more specific and relevant guidance, we find no indication that it is."); *see also Barhoumi*, slip op. at 11 (holding that under circuit precedent "a preponderance of the evidence standard is constitutional in evaluating a habeas petition from a detainee held at Guantanamo Bay, Cuba," and that the detainee's argument that "the Government should have been required to establish that [he] is lawfully detained under a standard of at least clear and convincing evidence" is "foreclosed by circuit

precedent") (internal quotation marks omitted).

Al Odah's second procedural argument fares no better. He argues that the Federal Rules of Evidence and the habeas corpus statute, 28 U.S.C. § 2241 *et seq.*, restrict the situations in which a district court may admit hearsay evidence in considering a petition from a person detained pursuant to the AUMF. The law is against him. As we quoted above, the Supreme Court in *Hamdi* stated that "[h]earsay . . . may need to be accepted as the most reliable available evidence from the Government" in this type of proceeding. 542 U.S. at 533-34. We applied the teachings of *Hamdi* in *Awad*, in which we explicitly held that "[T]he fact that the district court generally relied on items of evidence that contained hearsay is of no consequence. To show error in the court's reliance on hearsay evidence, the habeas petitioner must establish not that it is hearsay, but that it is unreliable hearsay." Slip op. at 11; *see also Barhoumi,* slip op. at 10 (holding that under circuit precedent, "hearsay evidence is admissible in this type of habeas proceeding if the hearsay is reliable") (internal quotation marks omitted); *Al-Bihani,* 590 F.3d at 879 ("[T]he question a habeas court must ask when presented with hearsay is not whether it is admissible . . . but what probative weight to ascribe to whatever indicia of reliability it exhibits.").

Whether a piece of evidence is hearsay is not at issue in this appeal. Rather, we review the decision of the district court as to whether the hearsay is reliable. The government offered reasons why its hearsay evidence had indicia of reliability, and the court considered the reliability of the evidence in deciding the weight to give the hearsay evidence. For example, in considering interrogation reports of a third party concerning al Qaeda and Taliban travel routes into Afghanistan, the court noted that this hearsay was corroborated by "multiple other examples of

individuals who used this route to travel to Afghanistan for the purpose of jihad." 648 F. Supp. 2d at 10. The court indicated that it was aware of the limitations of this evidence when it concluded that "[a]lthough far from conclusive, the Government's evidence suggests that an individual using this travel route to reach Kandahar may have done so because it was a route used by some individuals seeking to enter Afghanistan for the purpose of jihad." *Id.* This is exactly the analysis of hearsay which we subsequently approved in *Al-Bihani* and *Awad.* The district court correctly applied the law, and therefore, there was no abuse of its discretion.

Having thus rejected al Odah's two procedural challenges, we proceed to his challenges to the sufficiency of the evidence.

## B. Sufficiency of the Evidence

Al Odah argues that the evidence submitted to the district court was insufficient to establish that he was "part of" al Qaeda and Taliban forces. Al Odah has a heavy burden to meet to have this court reverse the district court's factual findings that are the underpinnings of its determination. As we have recently stated in an appeal with an identical procedural context:

> We review a district court's factual findings for clear error, regardless of whether the factual findings were based on live testimony or, as in this case, documentary evidence. *See Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985). "We further note that '[t]his standard applies to the inferences drawn from findings of fact as well as to the findings themselves.'" *Overby v. Nat'l Ass'n of Letter Carriers*, 595 F.3d 1290, 1294 (D.C. Cir. 2010) (*quoting Halberstam v. Welch*, 705 F.2d 472, 486

(D.C. Cir. 1983) (alteration in *Overby*). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Boca Investerings Partnership v. U.S.*, 314 F.3d 625, 629-30 (D.C. Cir. 2003) (*quoting United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). But "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Overby*, 595 F.3d at 1294 (*quoting City of Bessemer*, 470 U.S. at 573-74) (omission in *Overby*).

*Awad*, slip op. at 10.

Al Odah makes several challenges to individual pieces of evidence. In considering these challenges to the individual pieces of evidence, we must keep in mind that the purpose of our inquiry is to determine whether, overall, the district court's finding was supported by sufficient evidence. *See Awad*, slip op. at 10-11 ("We will begin with Awad's challenges to the individual items of evidence. In evaluating these challenges, we do not weigh each piece of evidence in isolation, but consider all of the evidence taken as a whole.").

Al Odah argues that the district court made several errors in not adopting his understanding of the facts and in drawing inferences unfavorable to him from the undisputed evidence. Al Odah defends his following instructions from ███████. He argues that while ███████ was a Taliban official, he was a civilian official and not part of the Taliban's military. Al Odah

argues that it was reasonable for him, a foreigner in a strange country at a time of war, to seek out and follow the advice of knowledgeable locals. But this argument asks the court to ignore all the other evidence in the case. What matters is not only the formal position of ███████ in the Taliban government, but what kind of instructions he gave that al Odah followed. ████ ████ took al Odah to a camp where he trained on a Kalashnikov AK-47 rifle. ███████ gave al Odah instructions on where to go after the September 11, 2001 attacks. Al Odah followed ███ ██████'s instructions to go to a house. At this house, al Odah gave the person in charge of this house his passport and major possessions, which was standard al Qaeda and Taliban operating procedures. ███████ gave al Odah instructions on where to receive weapons training, where to go after the September 11 terrorist attacks, where he could stay for free, and introduced him to people from whom he acquired an AK-47. For several months, al Odah followed instructions of a military nature from a member of the Taliban. We uphold the district court's rejection of al Odah's attempt to put an innocuous gloss over these undisputed facts.

Al Odah also argues that it was not nefarious for him to carry a rifle while in Afghanistan. Al Odah argues that rifles were common in Afghanistan, and that he carried the AK-47 for self defense. Again, al Odah is asking this court to examine this single piece of evidence in isolation. Al Odah did not simply possess a weapon. Rather, the evidence shows that ███████, a Taliban official, took al Odah to a Taliban-run camp to train on an AK-47 rifle. ███████ then provided al Odah a recommendation to find a person, who subsequently introduced him to another person who gave al Odah the same type of AK-47 rifle as that on which he trained. Al Odah then carried this rifle for days during an armed march through the Tora Bora mountains, a march during which al Odah and his fellow

travelers were attacked by US and allied warplanes.

Al Odah argues that the district court was also in error to fault him for not leaving Afghanistan immediately after September 11, 2001, and that the district court failed to consider that he was stuck in a foreign country trying to do the best he could in a chaotic situation. But the district court considered exactly that. It considered, and rejected, al Odah's argument that he chose what he thought was the quickest way to leave the country. It found that when al Odah had a choice to head out of the country or to stay, he consistently chose to remain in Afghanistan following directions of a member of the Taliban.

Al Odah further argues that there are benign reasons why someone would not travel with his passport while in Afghanistan. Perhaps there may be valid reasons for such behavior, but the district court considered this fact in the context of all the evidence in the case and found it to be incriminating. It was not clear error for the district court to do so.

We have considered, and rejected, al Odah's challenges to the individual pieces of evidence. The only remaining question is whether all the evidence before the district court was sufficient to support its finding that al Odah was "part of" the Taliban and al Qaeda forces. To simply recite the evidence and the inferences the district court drew therefrom is to answer the question in the affirmative regardless of the standard of review we use. *See Awad*, slip op. at 17 ("Determining whether Awad is 'part of' al Qaeda is a mixed question of law and fact. Whether our review of the district court's finding on this question is *de novo* or for clear error does not matter in this case because the evidence is so strong.").

Al Odah traveled to Afghanistan on a series of one-way

plane tickets purchased with cash in a manner consistent with travel patterns of those going to Afghanistan to join the Taliban and al Qaeda. Once in Afghanistan, al Odah sought out a Taliban official. This Taliban official led al Odah for a month doing we know not what, but culminated in the Taliban official taking al Odah to a Taliban-run camp to train on an AK-47 rifle. After the September 11, 2001, terrorist attacks, ████████ told al Odah where he should go and who he should seek out to help him. Al Odah did what ████████ recommended to him. He gave up his passport and other possessions, and obtained an AK-47 rifle, as he stayed with several individuals over several months. He then went on a march through the Tora Bora region for ten days with 150 men, some of whom, including al Odah, were armed. This march was attacked by US and allied warplanes.

Al Odah attempts to rebut the government's case only by presenting a gloss of innocent activity over several of the undisputed facts. The district court considered all the evidence, rejected al Odah's explanation of the evidence, and held that al Odah was "part of" al Qaeda and Taliban forces. There was no error in this finding, under either a *de novo* or clear error standard of review.

The district court had before it further evidence that supported the correctness of its conclusion. The district court did not need to rely upon this further evidence because of the weight of the other evidence, but it mentioned the existence of the evidence, and we note it to emphasize that it is further support for the district court's finding. ████████████████████ ████████████████████████████████████████ His passport, which he had surrendered to ████████, was discovered in an al Qaeda safehouse. Two other individuals have identified al Odah as a Taliban and al Qaeda member. All

this evidence is above and beyond what is necessary for us to affirm the district court's conclusion that al Odah was "part of" al Qaeda and Taliban forces.

The district court's alternative basis for finding that al Odah was "part of" al Qaeda and Taliban forces was that he trained at the Al Farouq training camp. Al Odah raises several challenges to the factual findings underlying this conclusion by the district court. But as we have upheld the district court's finding that al Odah was "part of" al Qaeda and the Taliban by his activities in Afghanistan separate from the allegations that the camp he attended was Al Farouq, we do not need to consider this issue. Once the government has established by a preponderance of the evidence that al Odah was "part of" al Qaeda and Taliban forces, the requirements of the AUMF are satisfied and the government has authority to detain al Odah.

## III. CONCLUSION

The law of this circuit is that a preponderance of the evidence standard is constitutional in considering a habeas petition from an alien detained pursuant to authority granted by the AUMF. *Awad*, slip op. at 17-18. Decisions of this court and of the Supreme Court have established that in this type of habeas proceeding, hearsay evidence is admissible if it is reliable. In our review of the record, we see strong support for the district court's finding that al Odah was "part of" al Qaeda and Taliban forces in the fall of 2001. Accordingly, we affirm the district court's denial of al Odah's petition for a writ of habeas corpus.

*So ordered.*